May it please the Court, Anthony Bornstein on behalf of David Foster. Your Honors, in 2003, the State of Oregon, in responding to Mr. Foster's post-conviction relief petition, argued in part that the PCR court should deny relief on this claim, and in part argued that they should reject the testimony of Dr. Ronald Jallo, an osteopathic physician who provided a declaration in support of his petition, because Dr. Jallo, according to the State, didn't take into account the infant's skull fracture. We'll see that at page 290. There was no skull fracture in this case, and yet the post-conviction court relied on the State's arguments in denying Mr. Foster's post-conviction relief petition a significant error in a case involving alleged violent action against a child. That error itself stood on top of the prosecutor's statement in rebuttal closing argument that had no basis in the trial record of the case, that the reason that the defense did not call the expert who had sat in the courtroom was because she agreed with the State's experts. Again, there was no evidence about that. It wasn't an infant suggested. It was an outright explicit statement. You started with the two defaulted claims. Why don't you keep your voice up? I'm sorry, Your Honor. I was perhaps backing away from the microphone. Oh, no. You can just figure I'm on the other side of the river and you're talking to me. Go ahead. You started with the two defaulted claims. I gather that's where you're starting. Well, the one defaulted claim is the one pertaining to the prosecutor's misstatement. I believe that the significant error in the post-conviction proceedings in itself undermines the factual findings and the legal conclusions of the State post-conviction case. Why don't you start with the claim that is properly before us, right? There's no – you don't have to get through the actual innocence gateway. Just start with that claim because I'd like to hear what you have to say about the ineffective assistance claim that is preserved. Here, as set forth in our brief, is the claim that the trial counsel provided ineffective assistance in essentially botching the medical case on behalf of his client. The expert was out of town until after the trial started. The expert was not – the defense attorney did not meet with the expert before the trial. There was passing of materials from initial trial counsel to later trial counsel. And as you see from the deposition – Let me jump in because – tell me if I'm misconceiving the case. But as I see it, in order to get around the deference that we owe the State court under AEDPA, you would have to show that the trial lawyer's reliance on that letter that they had from the expert was basically unreasonable. Do you agree with that characterization of the issue? Well, the trial – the letter is actually – sets forth exculpatory facts. The letter that was provided to the initial defense attorney who had the case. So that letter provided a basis to follow through with the defense that there was a non-criminal cause. But just let me tell you where I'm at in my thinking of the case. The trial lawyer has this letter that, you know, the expert says, hey, I'm willing to testify to these facts, which are going to be helpful to your client, right? And that, at least, is the explanation, I suppose, for why they didn't meet with the expert beforehand before trial, right? The State court seemed to make a finding that the expert's turn of – I don't know what you want to call it, but, you know, change of heart was completely unforeseen and unpredictable. And I guess I'd like to hear what you have to say about that finding. Again, I'll address that absolutely, Your Honor, and again point you especially to the arguments in our reply brief and our brief why these findings should not receive deference on that point. But most compellingly, the explanations by the defense counsel are flatly inconsistent. First, he says, I didn't call the expert because I felt I had essentially done enough damage to the State's case and its medical case through my cross-examination. I'll capital – I was going to capitalize on the weaknesses. He absolutely does not do that. In fact, he does the opposite. So his explanations are at odds with the record. He embraces the State's case in his closing argument, actually accepts the State's case as true, changes the course of the case entirely, and says, well, assuming everything they say is true, he – my client panicked and inflicted those injuries on the child, but not – I know, but the State post-conviction court, doesn't the court end up making basically what amounts to a credibility finding? But under Taylor v. Maddox, the court cannot ignore significant credible evidence in the record that undercuts the findings. And the – there is evidence in the record that contradicts reliable evidence, his own declaration as well as the initial declaration of the co-counsel that says, well, we didn't call the expert because we felt it was unnecessary. Unnecessary implies that you have something else. Yeah. No, I'm with you. I read that. But then during the deposition, the lawyer says, the expert came up to me and said, if I were you, I wouldn't call me as a witness. Well, if that's what happened, no competent lawyer in that circumstance would nonetheless put the expert on the stand just so that she could say, oh, actually, I agree with the prosecution. Well, then here's what the defense lawyer at least had to do. Number one, he's got to meet with the expert beforehand. Two, there is information in her letter as confirmed and corroborated by her subsequent letter or declaration in the post-conviction case that says, these were the inaccuracies I saw in Dr. Zennel, the state doctor's testimony. And so at the very least, he should have probed on cross-examination the weaknesses that Dr. Grist did identify. So that's number one. Second of all, a lawyer cannot concede guilt, and that's effectively what he did here. When he initially promised that he was going to call an expert to supply a non-criminal, I'm sorry, a non-criminal cause for the child's injuries, then essentially adopts and does embrace and adopt the state's experts' conclusions and medical opinions as to what happened to this child and says, well, he just did it in a panic. In fact, in one page of the transcript, you'll see the word panic about four times. He, in effect, buries his client with an admission that it happened, it happened at his hand, and he just didn't do it knowingly. Even if we were to assume that there was deficient performance and by representing that he was going to call, that they were going to call the doctor, Dr. Grist, failing to meet with the doctor ahead of time. It still has to show prejudice. Right. And I'm sorry. Address that for a moment. Okay. First of all. And it wasn't. The State put on a pretty strong case, circumstantial evidence. They had doctors who got up there and opined to a medical certainty that the baby's injuries were a result of. Again, there still has to be an adversarial proceeding. And the lawyer. It wasn't an adversarial proceeding. It has to be a meaningful adversarial proceeding. And when a lawyer essentially. They put on strong evidence about what a nice fellow he was and a gentle person he was and all of that. Well, then he at least should have supplied alternative explanations, even if they did not overcome every element. Here's the question for me. You have to show prejudice. Even if you assume that there was ineffective assistance or deficient performance, prejudice requires a showing that it's, that had there not, had he not engaged in that deficient performance, it's reasonably probable that the outcome would have been different. So if he had presented, let's say if he had actually presented the doctor, is it reasonably probable that the outcome here would have been different? If he supported his own client's testimony, if he at least engaged in cross-examination that pointed out some of the weaknesses. The testimony of Dr. Gries. Or Dr. Oaks. Say that it was reasonably, reasonably probable that the outcome of the trial would have been different. And if so, give me the argument. Well, that's a standard less than preponderance of the evidence. If he contested the State's case with facts that were exculpatory as expressed in Dr. Gries' testimony that would have been so exculpatory that we could reasonably say that the outcome would have been different. She undermined the 100 percent conclusion of Dr. Zemel through explanations of some of the triad of baby, shaken baby syndrome that were presented in the State's case. And then Dr. Jallo presented an affidavit as well that, again, may not have covered every aspect of the medical symptoms that the child exhibited, but did provide exculpatory alternative explanations that were reasonably available to trial counsel at the time of the criminal trial. As you understand, Dr. Gries' what she said in her affidavit, what were those alternative explanations? Your Honor, I would have to go back and remind myself exactly what she did provide. But she disagreed with them. Now, following up on one of the questions that Judge Watford asked about whether there was any surprises, it's not entirely clear to me when she was able to see the hemorrhaging, the slides on the eyes and the hemorrhaging. There's ambiguity as to when exactly the radiographs regarding the eyes became available. And a competent defense lawyer then seeks a continuance if there's been a discovery violation regarding key evidence that's not presented to the defense until the middle of trial. Nonetheless, the doctor shows up. I mean, she was from New Mexico, I gather. Yes. She arrives in Coos Bay after the trial is already underway. Is that right? Yes. Yes, exactly. And I gather she hits the slides at that time. It's somewhat unclear about that, but I think that's a reasonable conclusion. Yes. And so a competent defense lawyer at that point seeks a continuance of the trial, points out the discovery violation, and either seeks preclusion of testimony regarding them or at least ask for time for the expert to consult the literature or other evidence pertaining to those slides to determine if there is an alternative explanation for what she sees there. And if Your Honor? You want to save some time for rebuttal? Yes, Your Honor. I also would like to address the actual innocence evidence as well. But I can save that. Well, you can do that now if you want, but you're running out of time. You've got two minutes and two and a half minutes. Thank you, Your Honor. I'll save the remaining time for rebuttal. May it please the Court, Caroline Alexander for the State of Oregon. I'll start with the exhausted claim. As this Court appears to recognize, we have a doubly deferential standard of review. And if nothing else, this case turns on the standard of review. Bring the microphone a little bit closer. Stand closer. Okay. Is this better? Yeah, that's better. Thank you. It's important that Judge Pregerson be able to hear you. Absolutely. So speak directly into that mic. Thank you, Your Honor. As I said, this case turns on the standard of review. As for the exhausted claim, we have a doubly deferential standard of review under INPA. Let's talk about Dr. Graist for a minute. So the circumstances are critical, and the facts before the post-conviction court are critical in this case. Melvin Davidson and Pat Davis, who Mark Hendershot replaced in the middle of trial preparation, retained Dr. Graist from New Mexico. Six months before trial, she offered a favorable opinion for the defense. At the time of trial, there was a storm, and she was delayed and didn't arrive until after trial had started. Dr. Graist sat at counsel table, and the trial transcript clearly shows she was assisting defense counsel from the minute she got there. She heard the state's experts. The retinal images were delayed for some reason. The defense didn't have those images until Dr. Graist arrived and after trial had started. She heard the state's experts. She looked at these images and told trial counsel, and both Hendershot and Melvin Davidson testified, Hendershot in his deposition, Melvin Davidson at the post-conviction trial, that Graist changed her opinion and said, I can still offer my original opinion, but if I'm pushed by the prosecution on cross, I'll have to agree with the defense experts. With the prosecution's experts. I'm sorry. With the prosecution's efforts. Correct. Okay. I mean, we got that. But I guess in my mind, even just the scenario you've just painted, I mean, this is just beyond malpractice in my mind. Not maybe to fail to meet with the expert beforehand, right, because they did have the letter, but if you're going to stand up in your opening statement and make a promise about testimony from an expert whom you've never met with, you've never discussed, you've never gone through any prep to see, in fact, how they might hold up on cross-examination, I just don't see how any reasonable state court judge could say that that didn't constitute deficient performance. And so I'd like to hear what you have to say in defense of that conduct. Yes, Your Honor. Again, I think it turns on the facts. So Hendershott replaced Davis and Melvin Davidson prepared Grist for trial. They understood her opinion to be favorable. There's nothing before the state post-conviction court that said that changed up until Dr. Grist listened to the state's experts and changed her mind at that point. It comes down to prejudice, if nothing else. So the problem, just to pick up a point on Judge Watford's comment, is I guess Melvin Davidson gave the opening statement. Correct. She did this even before the rights arrived in Coos Bay. Correct. Because she believed her opinion would be favorable. Right. She had the letter. Right. They had not – I didn't see anything in the record that suggests they had discussed her testimony before she arrived in Tarrant. I think that's correct, Your Honor. There is nothing in the record that indicates that. She stands up there in front of the jury when she gives her opening statement right after the prosecutor gives her opening statement. She says, Dr. Grist will give you quite a different explanation for her medical condition and how she could have gotten in that medical condition. And at that point, she believed that to be true. Even – But why – it's hard to imagine that a lawyer would do that. I mean, if you're going to do that, you might say at least she could have waited until the defense presented its case and then given her opening statement at that time. Presumably, she would have had an opportunity. She could have. But I think that Melvin Davidson reasonably believed her testimony would be favorable. There was nothing indicating that it wouldn't be. And it really comes down to prejudice. Even if trial counsel had met with Grist, she wasn't saying anything different at that point. It wasn't until after she heard the State's experts. She couldn't have waited until closing argument to talk about you heard something different. You know, I suppose arguably they could have waited. But there was nothing telling them that they needed to wait at that point. So it wasn't until after the State's experts testified that Grist said, no, wait a minute, I'm changing – I'm changing my mind. Harrington v. Richter is probably our seminal case in dealing with trial counsel and experts and what's reasonable for trial counsel – trial counsel's use of experts. So after Grist says, don't put me on the stand, she continued to sit at the counsel table and advise defense counsel how to cross-examine the State's experts. Under Harrington v. Richter, that's reasonable. But, again, it comes down to prejudice. So had trial counsel met with Grist, she wasn't saying anything different then. So – Well, I mean, the prejudice is from having made the promise that the lawyers couldn't then deliver. And we have two cases from our circuit that are quite strong on that point, right, the SESI or however we say that and our chief judge's opinion as a – sitting as a district court judge. You don't make a promise to the jury that you're not 100 percent sure you can keep. And I don't see any basis for them being 100 percent sure because they had never even spoken, not even on the phone, with the expert whom they were promising the jury would give a very different account of the medical evidence. So then we look at prejudice from a different lens, which is had they put on Dr. Grist what would have happened? Is it reasonably probable that the outcome would have been different? Dr. Grist couldn't account for the rib fractures. She said she would have agreed with the state's experts if pressed. It wouldn't have made a difference. Well, how do we know that? That's speculation, isn't it? When you're dealing with a jury, you know, it's a very, very delicate situation. We never know what's going to turn the matter one way or the other. It is, Your Honor, and I agree. But regardless of – I mean, do you really believe that this defendant had competent lawyers? I mean, here they are. They take this case over. They've got an old report. They don't talk to the expert, Dr. Grist, until she walks into the courtroom, as far as I know. And the defense counsel was certainly aware that there had been some earlier hearings. Am I right on that, on the parental right issue? I'm sorry. I'm having difficulty understanding your questions. I'm not hearing correctly. Well, was there a hearing before this criminal case that involved the parental rights of the defendant? Oh, yes. Yes, Your Honor, there was. Yes. So the defense counsel had a pretty good idea of – and those same experts testified at the trial, didn't they? Yeah. So did she know all that? Was that information conveyed to her? That's not in the record, Your Honor. Oh, you know, I know it's not in the record, so I'm assuming that didn't happen. Because any reasonable, you know, marginally competent lawyer would have presented that evidence to someone they thought they were going to call as an expert and then promised to call them. With all due respect, Your Honor – You know, the whole thing sounds like one of these Keystone Cop scenarios. I mean, everybody's running in different directions. It's just – it's sad when you read this. But, you know, that's the way our system works. Well, with all due – The great writ ain't worked too much these days. With all due respect, Your Honor, it doesn't matter what I think or what any individual judge thinks about competency of counsel. It was the decision by the post-conviction court reasonable that under these circumstances, trial counsel's use of the expert was reasonable. And – Well, I think that's kind of a silly conclusion, you know. That's what AEDPA requires, Your Honor. Yeah, I know. Silly conclusion. Okay. And the post-conviction court also found that petitioner didn't present evidence of an available expert to testify in his defense given the fact that Dr. Greese changed her mind during trial. Yeah, but he could have asked for a continuance. He could have made a record on that. Mark Hendershot testified that this judge would have given him a continuance of 20 minutes. Yeah, but he should have had a record on it because if that's what the judge did, you know, that would have been a very egregious, harmful ruling. And I just can't imagine in a case like this that a judge – you know, if a judge would make a decision like that, then I'd have more problems. I mean, we're supposed to give people a fair trial. We're supposed to have competent lawyers, reasonably competent, maybe even marginally competent. I just don't see that here. Dr. Greese, if I recall, and I may be timing a little bit off, but if I remember correctly – And why didn't the State make available that information on the renal bleeding? Judge Ferguson, I want to ask counsel a question here. Melvin Davidson, I believe, when she gave her opening statement, said that this case boiled down to experts. I can't hear that one. That the case boiled down – that the State's case boiled down to the experts and the experts were all going to testify that the petitioner was responsible. Yes, Your Honor. Is that right? I mean, was that – the State pitched it as a – the key part of the case was all about the medical evidence. Well, yes, Your Honor. It was a circumstantial case regarding how it happened, right? Largely, I think that's correct, Your Honor, yes. And defense counsel said, yes, it is. This is a case about experts. This is a case about expert opinion. And even the State's experts don't agree. Didn't she say that? That I don't recall, Your Honor. I don't recall her saying the State's experts didn't agree. I think – There was some variation in their testimony or something. My point is, didn't – wasn't – in that scenario, wasn't Dr. Grice's proposed testimony essential, critical? I mean, it was fundamental to the defense, the way the defense kind of pitched the case at the outset. Had she testified to her opinion, as she said she would have in the post-conviction case, and not on cross agreed with the State's experts, and had she been able to account for the rib fractures in addition to the triad of shaken baby syndrome, I think that would be true, Your Honor. But there were some critical mistakes or at least omissions or just glaring  Now, that probably begs the question, should defense counsel have gotten another expert? But under this Court's law, it's not required. She gave a favorable opinion. They relied on her. In fact, Melvin Davidson testified, I wanted her to testify in any event, and I tried to talk her into it. She kept telling me, don't put me on the stand. Well, then he changed his explanation several times. He's a very reliable guy or person. Trial counsel, Your Honor? Yeah. Well, no, actually he didn't. He gave a statement in an affidavit, then in his deposition he clarified what he meant by that. Given Dr. Grice's position, with her assistance in Cross, he decided that was the best use of his expert. In closing argument, he did argue that BS injuries were caused from birth trauma. He did make that argument. But Dr. Silverberg, the State's expert radiologist, gave him an in during his testimony to also say, and it could have been unintentional, because no matter what, no defense expert could account for BS ribs fractures. And Petitioner got up there on the stand and demonstrated how he shook her with his hands around her ribs. If you're defense counsel, you have to do something with that. Otherwise the jury is going to convict you. You have to do something. And I think Richter is a good opinion to explain what defense counsel has to do as a constitutional matter in a situation similar to that. The Court has no further questions? Thank you so much. Your Honors, I would dispute entirely. Sorry. I would dispute entirely that the explanation that was provided in the deposition by trial counsel is simply a clarification. It stands not only at odds with a different explanation for not calling the expert, i.e., I just felt it was unnecessary because of the weaknesses that we were going to then point out in the State's case. He then contradicted his own explanation by the manner in which he presented the defense in his summation. When he embraced the State's experts, didn't point to one weakness in the State's case, much less weaknesses, and instead offered an explanation that was not only entirely damaging, but was damaging in light of what his client had testified to. And the statement that Mr. Foster demonstrated, the shaking, again, as is stressed in my reply brief and in particular in appendix where I set out the testimony, the shake that he did explain and describe was not causal of the injuries. What he was explaining was that after the child had gone limp and the arm dropped and the eyes rolled back in the head, he did a movement in the courtroom to show what he did before he brought the child up to his mother's. That's different than an explanation regarding shaking the baby causing the injuries. Your Honor, I only have a minute left. And, again, I think the schlup gateway should apply here. It's been briefed extensively both in the district court and on appeal. In retrospect, perhaps, I should have sought this Court's permission for an oversized brief, but in that I did not, I would ask the Court to specifically review Excerpt of Record V with the declarations of surpassingly qualified and unbiased specialists and experts, including the expert accredited by the court in Delpritte, which I cited in the 28J letter. He is the chief pediatric neuroradiologist at the Lucille Packard Children's Hospital at Stanford University Medical Center, and he offers an opinion that it is highly unlikely that the injuries here came about through shaking. I think you did a very competent job presenting the new expert testimonies. I don't think you need to feel that you shortchanged the Court in any way on that. But I guess I came away from reviewing all of that feeling as though, well, the State came back with new expert opinions of its own, which, you know, more or less neutralized all of the new. Am I wrong on that? Help me on that. I believe you're wrong on that, respectfully, Your Honor. Incorrect. First of all, the jury has never heard, a jury has never heard a contested view of the evidence. So the question, unlike what the district court framed it, is not, well, this is just a battle of the experts, so we'll never know what really happened. The test under Schlup and Howes is what would a reasonable juror, properly instructed, do with this new evidence. And under the new evidence, we not only have Dr. Barnes's medical expert opinion, the experts' opinions of specialists, including radiologists and ophthalmologists with 45 years of experience. You have to ask yourself, what would reasonable jurors hearing this alternative explanation do in the jury room? And they would find a reasonable doubt. It's an alternative explanation which, at every turn, the State's new expert opinions rebut. Well, even if they then, on direct testimony, rebutted it, a reasonable juror would hear contradictory testimony from those so-called rebutting experts. I'll point out a few, if I may, and I know I'm running over, but I think there's some key points here that I think respond directly to Your Honor's question. In 2010, Dr. Zenil supplied a declaration in the district court in the habeas case, and he said the rib fractures are due to squeezing or crushing of the chest. That's not what he testified to. That's not what the prosecution argued. He said those injuries were due to violent shaking. So he's contradicting himself. The jury wouldn't necessarily say, well, Dr. Zenil's got an expert opinion. They would look, a reasonable juror would look at the contradicting expert. He admits something incredibly important in the district court habeas case, which he says actually would worry him. He hadn't examined the measurements of the baby's increasing head size from birth through the event in December 21st, and he said, oh, if I did realize that the head measurements were that significant, the head was expanding, that would worry me. A reasonable juror hearing the doctor testify to that in cross-examination is going to have a reasonable doubt. And I think this is very significant. And this is it. Okay. Respondents of experts shifted on one of the classic symptoms of the so-called shaken baby syndrome triad, the existence of edema. In trial, both Dr. Zenil and Silverberg said that the infant suffered edema. In 2010, when the State consulted with Dr. Valvano, he found no edema in the list of symptoms, and you'll see that at ER 675. A reasonable juror hearing these and other contradictions supplemented by the surpassingly qualified experts that were presented in the district court, which were unrebutted, unrefuted, nonbiased experts, would find a reasonable doubt. Thank you, Your Honor. Thank you, counsel. We appreciate your arguments in this case very much. Very good argument. Yes. The matter is submitted.
judges: PREGERSON, PAEZ, WATFORD